UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

**95-2037**
**CIV - KING**

AIR CANADA, INC., DELTA AIR    :   CASE NO._____
LINES, INC., TRANS WORLD
AIRLINES, INC., UNITED       :   **MAGISTRATE JUDGE**
AIRLINES, INC., USAIR, INC.,  :   **GARBER**

       Plaintiffs,             :

vs.                             :   **COMPLAINT**

DADE COUNTY, a political      :
subdivision of the State of
Florida,                       :

       Defendant.           :
_____ :

      Plaintiffs, Air Canada, Inc., Delta Air Lines, Inc., Trans

World Airlines, Inc., United Airlines, Inc., and USAir, Inc.

("Airlines") sue defendant, Dade County ("County"), a political

subdivision of the State of Florida, and for their complaint

allege:

      1.     This action arises under the Federal Aviation Act

(under the provision known as the Federal Anti-Head Tax Act) at

49 U.S.C. § 40116, the Federal Declaratory Judgment Act, 28

U.S.C. §§ 2201-02, the Constitution of the State of Florida and

the laws of the State of Florida as hereinafter stated.

)                                    )

## The Parties

2.   The plaintiff Airlines are commercial air carriers which use and operate facilities at Miami International Airport for the purpose of providing interstate and international commercial air transportation service.  The state of incorporation and principal place of business of each plaintiff is as follows:

a.   Air Canada, Inc. is a Canadian corporation with its principal place of business in the province of Quebec.

b.   Delta Air Lines, Inc. is a Delaware corporation with its principal place of business in the State of Georgia.

c.   Trans World Airlines, Inc. is a Delaware corporation with its principal place of business in the State of Missouri.

d.   United Airlines, Inc. is a Delaware corporation with its principal place of business in the State of Illinois.

e.   USAir, Inc. is a Delaware corporation with its principal place of business in the State of Virginia.

3.   Defendant, Dade County, a political subdivision of the State of Florida, owns and operates Miami International Airport (the "Airport") and leases premises at the Airport to the Airlines.

-2-

## Jurisdiction and Venue

4.    Pursuant to 28 U.S.C. §§ 1331 and 1337, jurisdiction is founded on the existence of a federal question arising under the laws regulating commerce.

5.    Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the state law claims herein as they form part of the same case or controversy and are substantially related to the federal claims.

6.    Pursuant to 28 U.S.C. § 1332, jurisdiction is also founded on the existence of diversity as all plaintiffs are not citizens of the State of Florida and do not have their principal place of business in the State of Florida and the Defendant is a citizen of the State of Florida headquartered in Dade County, Florida.  The amount in controversy exceeds the sum of $50,000, exclusive of interest and costs.

7.    Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events giving rise to the claims occurred in this district and the defendant resides in the Southern District of Florida.

## General Allegations

8.    The Airlines are all air carriers operating from the Airport.

9.    The plaintiffs' need for relief arises from the same transaction or occurrence and involves common questions of law and fact.

-3-

10.   Each of the Airlines have individual contracts with the
County under which they lease premises within the Airport (the
"Leases").[1]  As a result of the Leases, all of the Airlines
jointly use the current gate[2] facilities and other areas of the
terminal building and airfield, and no airline has the exclusive
right to use any of the gates.

11.   The Airport has been undergoing a significant
improvement and expansion process pursuant to a program known as
Program 70's (now known as Airport 2000).  This development
project was financed primarily through the issue of Revenue Bonds
issued under a 1954 Trust Agreement ("Revenue Bonds").  The debt
on those bonds is serviced through the assessment of terminal
rents, user fees and charges associated with the use of the
Airport facilities.  In order to finance the Program 70's project
through the issuance of Revenue Bonds, the Airlines[3] and the
County executed a series of supporting agreements, supplements,
and amendments (the "Supporting Agreements").

_____

[1]The term "Leases" refers to the leases of all of the Airlines except
Delta.  Delta does not join Count IV of the complaint.

[2]At the Airport, a gate is a docking position and adjacent holdroom
facility that is connected to the terminal and that is used for boarding and
deplaning.

[3]The term "Supporting Agreements" refers to the Supporting Agreements of
all of the Airlines except Air Canada and Trans World Airlines.  Air Canada
and Trans World Airlines do not join Count V of the complaint.
     Delta has executed documents substantially similar in content and effect
to the Supporting Agreements and the supplements and amendments executed by
the other parties; however, Delta's supplements are titled as supplements to
Delta's lease with the County.  For convenience, Delta's documents are
referred to herein jointly with those of the other Airlines as "Supporting
Agreements."  Delta effectively has the same rights with respect to the
Supporting Agreements as the other Airlines.

-4-

12.   Under the Supporting Agreements the Airlines agreed to pay fees sufficient to meet the rate covenant set forth in the 1954 Trust Agreement with respect to bonds issued to construct the Program 70's projects.   Under those same Supporting Agreements the County cannot modify Program 70's construction as defined by the County's Master Plan or add additional improvements without first obtaining the approval of the Airlines.[4]

13.   The County is now planning new construction at the Airport.   It has executed an agreement (the "American Agreement") with American Airlines ("American") that will grant American what equates to an exclusive right[5] to use a 47 gate concourse that will be built at a cost anticipated to reach $975 million.[6]   This new project will require the demolition of a significant portion of the current Airport premises, including concourses B, C, and D, that were built as part of Program 70's and were financed by Revenue Bonds for which the Airlines are still paying a portion of the debt.   The new American concourse has been referred to as

---

[4]The form of this approval is outlined in paragraph 24.

[5]The American agreement provides that the other Airlines may use the gates at American's discretion.   This amounts to exclusivity.   Any holder of exclusive rights may consent to allowing others to occasionally use the facilities.   Thus, the American arrangement will hereinafter be referred to as "exclusive."   The new concourse will be "owned" by American to an extent unprecedented at the Airport.   It will control the project from the first day of construction and will have rights in that concourse far beyond what the other Airlines have been allowed.

[6]This figure does not include the costs of other projects that would not be necessary were the American terminal not to be constructed.   These additional costs are approximately $300 to $500 million.

-5-

)                                    )

the "A-D" concourse, or "Super A," because it will fill the
entire area now known as concourses A, B, C, and D.  The net
result will be to reduce the current available gates for the
other airlines from the 108 currently available to 61.

14.  The project outlined in the American Agreement (the
"American Project") is to be financed through the issuance of
Revenue Bonds under the County's 1954 Trust Agreement.  Under the
County's formula for "equalized rents and fees," the additional
debt for the American Project will be serviced through a uniform
assessment of increased terminal rents, user fees and charges
paid by all of the Airlines for terminal space and facilities
throughout the Airport.  Thus, all of the Airlines will be paying
to demolish part of the current facilities that they now lease or
use in order to construct a new facility which they will not be
allowed to use except at American's discretion.  The Airlines
will also continue to pay for certain portions of the demolished
facilities through the debt service on outstanding bonds issued
to construct those facilities.

15.  In addition to the costs associated with the higher
rents and fees, the Airlines will be required to assume a
significant financial risk if the American Agreement is
implemented.  Through their Supporting Agreements, the Airlines,
so long as they continue to serve the Airport, may be held to a
commitment to pay user fees that are sufficient to cover the
principal and interest on all Revenue Bond debt, including
American's new superconcourse.  The County proposes to include

-6-

)                                    )

debt service on Revenue Bonds it will issue to finance the
American Project in the rates and fees of the Airlines.  If that
is permitted and if American reduces its operations for any
reason, as it has in recent years at many of its other major hub
facilities, including Raleigh-Durham, San Jose, and Nashville,
the other Airlines would be forced to shoulder a significantly
larger proportion of the costs of the American Project, or exit
the market in Miami entirely.  This excessive and unnecessary
financial risk jeopardizes the fiscal security of all of the
Airlines' operations at the Airport and the fiscal security of
the Airport itself.

     16.  The facilities to be constructed for American's use are
qualitatively different than anything constructed for any of the
other Airlines.  The American Project constitutes a project that
is unprecedented at the Airport and the facilities to be
constructed for American are in kind and quality different from
the facilities that have been constructed (or are planned to be
constructed) for the operations of the other Airlines serving the
Airport.  For example, a passenger train system, estimated to
cost in excess of $100 million, and a state-of-the-art people
mover will both be constructed to serve only the American
superconcourse.  A dedicated, state-of-the-art, $100 million
automated laser baggage sortation device, serving only American's
superconcourse, is also planned.[7]  None of these improvements

---

[7]American may finance a portion of its baggage system, but the rest will
be paid by the Airlines through their fees and charges.

-7-

will be usable by the other Airlines, yet under the County's financing scheme and equalized rental formula, the other Airlines will be forced to absorb a substantial share of the cost of this new superconcourse.  To illustrate American's desire for a "Taj Mahal" among terminals, American rejected one, albeit still excessive, proposal offered by the County that would have yielded the same number of gates but would have cost hundreds of millions of dollars less.  At other airports, unique, dedicated, special facilities such as American's superconcourse have been financed through special facility revenue bonds, which are paid exclusively by the airline reaping the benefits of the new facility. In contrast, American will pay the same rates as everyone else without regard to its unique and highly favorable situation. Furthermore, American, not the County, will manage and supervise the construction.  This has never been done in the past for a project of this magnitude.  As a result, American can insure that the terminal is exactly tailored to suit its personal needs.

17.  The Airlines will be paying higher rents and user fees, and assuming substantial financial risk, for vastly disparate facilities and rights.

18.  The terminal rents, user fees and charges that the Airlines currently pay are projected to increase at least 50%. Correspondingly, the cost of carrying air travelers in interstate commerce will also significantly increase.  The Airlines will be forced to charge higher rates and/or suffer higher unrecovered

-8-

operating costs.  In return, the Airlines and their customers will be burdened with reduced gate access which will severely hamper their ability to expand and will adversely affect the national air transportation system and the international air transportation system.

19.  The rents and fees will discriminate against the Airlines because, among other things, the Airlines will be paying disproportionate terminal rents, user fees, and charges to subsidize American's state-of-the-art, dedicated hub facility. American will receive exclusive rights to use facilities that are vastly superior in kind and quality in return for the same rents and fees as those charged to the other Airlines.  For these and other reasons, they are unreasonable.

20.  According to the County's prior Official Statements that were issued in conjunction with the bonds that finance the Airport, the County's policy is not to enter into agreements that directly or indirectly result in exclusive gate use.  The Airlines do not agree that the restriction as to gates is necessary, but have reluctantly acquiesced to this policy , which the County has used to limit all airlines to nonexclusive facility arrangements.  In contrast, the County is now granting American rights that are superior to those possessed by the Airlines in facilities that are superior to any currently used by the Airlines.  American's rents and fees, however, will not proportionately increase to reflect its now superior rights and facilities.

-9-

21.  The 1954 Trust Agreement provides that the fees will be assessed based upon use.  The Trust Agreement defines projects as improvements if they are "required for the efficient and economical operation of the airport," and requires the County to operate the Airport in an efficient and economic manner, to manage the Airport in a prudent manner, and to not incur excessive expenses.  That Trust Agreement has been incorporated by reference into the various Leases.  The unnecessary expense of creating an A-D superconcourse with extravagant facilities and the significant financial risks associated with the American Project are among the many reasons that the project will be inefficient, uneconomical, imprudent, and excessively expensive.

22.  Article 20 of each of the Leases (Article 19 in the case of Air Canada) incorporates by reference all of the terms of the Trust Agreement.  Article 11 of each of the Leases provides that the lessees shall have usage of the facilities, to include gates, in common with all other users.  It also states that the fees charged for such usage, such as terminal rents and landing fees, shall not be discriminatory.

23.  The Program 70's Supporting Agreements also state that rates and fees will be nondiscriminatory and that the Airlines will only be assessed for costs directly attributable to Program 70's construction.

24.  Under the Second Amendment to the Supporting Agreements,[8] the approval of a group of Airlines identified as

---

[8]Delta has the same rights in the Fourth Amendment to their Supplement.

COLL DAVIDSON CARTER SMITH SALTER & BARKETT · PROFESSIONAL ASSOCIATION · ATTORNEYS AT LAW · (305) 373-5200

)                                    )

Majority-in-Interest ("MII") members is required for any
amendments or changes to any construction performed pursuant to
Program 70's.  The MII members include airlines that have
executed Supporting Agreements.  In order to approve a project,
at least five of those signatory airlines who account for more
than 50% of the landed weight for the previous fiscal year must
submit signed letters to the County approving the project.  The
County has neither sought nor obtained the necessary approval of
five MII members as required in order to construct the American
Project.  Thus the County lacks the authority to begin the
American Project.  The County has not even made a pretense of
negotiating with the Airlines about the American Project.

25.  The Supporting Agreements also obligate the County to
negotiate with the MII members over any readjustment of their
rates and to give due consideration to their input.  For the
County to undertake the American Project, which will result in a
radical change in the Airlines' rates, without first negotiating
with the Airlines is a bad faith attempt to avoid its contractual
duties.

26.  In violation of the Supporting Agreements, the County
executed the American Agreement behind closed doors without
negotiating with the MII members, even though the American
Agreement requires the County to substantially raise the fees for
all airlines and to substantially alter portions of the Airport
previously approved by the MII members and constructed as part of
Program 70's.

-11-

27.   The Airlines repeatedly made their objections to the
American Agreement known to the County and demanded that the
County submit the matter to them in their capacity as MII
members, and that more fair and economical plans be considered.

28.   The County refused to negotiate with the MII members.

29.   Airport 2000 is federally funded in part by grants
under the Federal Airport and Airways Improvement Act of 1982, as
amended, 49 U.S.C. § 47107(a).  This act requires that each air
carrier be subject to substantially comparable rates and fees and
subject to substantially comparable conditions.  The American
Agreement insures unequal conditions for equal rates and this
discriminatory treatment jeopardizes those grants.  The potential
loss of the federal grants is one of the reasons that the
implementation of the American Agreement would be uneconomical.

<u>Federal Anti-Head Tax</u>

30.   The Federal Anti-Head Tax Act, 49 U.S.C. § 40116,
prohibits the levy of a tax, fee, or charge on:

> "an individual traveling in air commerce; the
> transportation of an individual traveling in air
> commerce; the sale of air transportation; or the gross
> receipts from that air commerce or transportation."

Under the Federal Anti-Head Tax Act, terminal rents and user fees
must be reasonable and may not constitute a burden on interstate
commerce.

COLL DAVIDSON CARTER SMITH SALTER & BARKETT  •  PROFESSIONAL ASSOCIATION  •  ATTORNEYS AT LAW  •  (305) 373-5200

)                                          )

## State Law

31.  Article 7, Section 10(c) of the Florida Constitution
requires that revenue bonds be paid solely from revenues from a
project and this provision is violated when the taxing power is
used to benefit a private entity or when the group that is taxed
will not receive any benefits from that tax.

32.  The Florida Port Authorities Act, Florida Statutes
§ 315.06, provides that projects financed thereunder must be paid
for out of the revenues of that project.  The purpose of this
statute is to insure that projects will be paid for by those who
use them, which avoids the Florida Constitutional limits on
taxation.

33.  The County's operation of the Airport is also subject
to § 125.012(10) of the Florida Statutes, regarding county home
rule powers, which provides that the County is authorized to fix
and determine the rates, tolls and other charges for the use of
airport improvements and facilities but only in accordance with
the State Constitution and the Constitution and laws of the
United States.

34.  Section 332.08(5), Florida Statutes (Airport Law of
1945), authorizes and requires the County to assess and collect
from the owner and operator of airplanes using the airport a
sufficient fee or service charge to cover the cost of the service
furnished airplanes using the airport.  This must be read in
conjunction with Florida Statutes, § 125.018, requiring that all

-13-

)                                    )

impositions and exactions by the County shall be just and reasonable and consistent with the public interest.

COUNT I.  Declaratory Relief Based upon Federal Law.

35.  The Airlines repeat and reallege each allegation in paragraphs 1 through 30 as if fully alleged here.

36.  The terminal rents and user fees to be imposed as a result of the American Agreement are not compensation for services rendered by the County.  Such "fees" are thus in actuality a tax imposed to favor a single air carrier by constructing exclusive facilities for that carrier from general revenues.

37.  The terminal rents and user fees will be excessive as they far exceed the County's needs for the Airport.  The fees are also excessive as they will not constitute a reasonable charge for using the facilities leased or used by the Airlines but rather will constitute a forced subsidy of the American superconcourse.  The American Project is an unnecessary expense far exceeding what the Airport's operational demands require.

38.  The terminal rents and user fees to result under the American Agreement will constitute a prohibited head tax imposed by the County, in violation of 49 U.S.C. § 40116.

39.  The terminal rents and user fees to be paid by the Airlines are not reasonable because they will constitute a general tax to raise money to construct new facilities for the sole benefit of American.

-14-

)                                           )

40.   The terminal rents and user fees to be assessed against the Airlines are a charge for the sale of air transportation, the gross receipts of air commerce, the transportation of individuals in air commerce, and those terminal rents and user fees will be passed on in part to individuals traveling in interstate commerce through their fares.

41.   By reason of the County's head tax, the Airlines have suffered or will suffer damage to their business through higher costs and reduced access to Airport facilities, and through the forced subsidization of a competitor.

42.   Despite the Airlines' demands for compliance, the County has persisted in proceeding with the American Agreement, even though it is in violation of the Federal Anti-Head Tax Act.

43.   An actual controversy exists between the Airlines and the County regarding the County's authority to enter the American Agreement as written, develop the American Project, issue bonds and assess excessive, discriminatory and unreasonable terminal rents and user fees, or taxes which purport to be fees, in order to finance the American Project and partially demolish the existing facilities for which the Airlines will continue to pay.

44.   The Airlines seek a judicial determination, pursuant to 28 U.S.C. § 2201, of the County's authority to enter into the American Agreement and issue bonds and assess terminal rents and user fees thereunder.

WHEREFORE, the Airlines request that this Court enter judgment declaring that (a) the County lacks authority under the

-15-

Federal Anti-Head Tax Act to assess terminal rents and user fees to pay the debt service on any general airport revenue bonds to be issued to finance the American Project; (b) any such terminal rents and user fees would be unreasonable, discriminatory, excessive, and a burden on interstate commerce; and (c) providing for such ancillary relief as the Court deems just and proper under 28 U.S.C. § 2201 and § 2202, including but not limited to the determination of reasonable terminal rents, user fees and charges applicable to the Airlines' Leases and use of the Airport facilities.

### COUNT II. Permanent Injunction
### Against the Violation of Federal Law.

45.   The Airlines repeat and reallege each allegation in paragraphs 1 through 30 and 36 through 42 as if fully alleged here.

46.   Because of the County's actions, the Airlines' operating costs will be greatly increased.  Furthermore, the Airlines' ability to provide services to their customers will be significantly hampered as the common pool of gates will be substantially reduced.  This will harm the Airlines' goodwill and undermine their future customer base.

47.   The County's actions will cause irreparable harm and injury to the Airlines because of the threatened loss of customers and the erosion of the Airlines' future business.

-16-

48.   The continuing harm to the Airlines caused by the County's conduct will greatly outweigh any possible harm that the County could suffer as a result of the requested injunction.

49.   The granting of injunctive relief is in the public interest.

50.   The Airlines have no adequate remedy at law because the injury to the Airlines will be of a continuing nature.  Effective legal relief would require a multiplicity of legal actions in that the Airlines would be required to pursue damages for each separate fee or rental charge and to contest each gate restriction or assignment.  There is no adequate legal remedy except to enjoin the American Project itself.

WHEREFORE, the Airlines request that this Court enter judgment (a) permanently enjoining the County from (i) issuing general airport revenue bonds for the payment of the American Project, the debt service for which will be includable in the Airlines' rates and charges; (ii) continuing in its performance of the American Agreement as written; and (iii) assessing terminal rents, user fees or charges of any kind based upon costs incurred in the construction of the American Project; and (b) for such other and further relief as the Court deems just and proper.

COUNT III. Declaratory and Injunctive
Relief Based upon Florida Law.

51.   Airlines repeat and reallege each allegation of paragraphs 1 through 29, 31 through 34, and 46 through 50 as if fully alleged here.

-17-

52.   The County's Agreement with American requires the County to pay for the construction of the American Project by issuing Revenue Bonds under the 1954 Trust Agreement.

53.   The County has already approved the agreement which legally obligates it to issue those bonds in that manner.

54.   The Airlines will not be allowed to use the 47 gate, "A-D" concourse constructed as part of the American Project, except at American's discretion.  Nevertheless, the debt service on these bonds will be paid in part by the Airlines.

55.   The debt on these bonds will not be paid for solely by the revenues of the new project.  All of the Airlines will be paying the debt service on the bonds through equalized terminal rents and user fees yet the new facilities will be controlled by American.  Thus, American's private gates will in fact be paid for by a tax on the other Airlines and their customers, and that tax will be used solely to benefit a private enterprise.

56.   This bond arrangement constitutes a violation of the Florida Constitution, Article 7, § 10(c), which requires that revenue bonds be paid for solely through revenue derived from the operation of the project.  The terminal rents and user fees constitute an improper tax to solely benefit private enterprise. The Airlines and their customers, who will pay a significant portion of this tax, will receive no benefit from it.

57.   This bond arrangement violates the Florida Port Authorities Act, Fla. Stat. § 315.06, pursuant to which the 1954 Trust Agreement was issued, because the debt will not be serviced

-18-

by project-derived revenues. Because the County cannot issue bonds absent authority for that issue, the contemplated bonds will be invalid.

58. This bond arrangement also violates § 125.0128 and § 125.018 of the Florida Statutes as the rates will not be in accordance with federal and state laws, will not be reasonable, and will be inconsistent with the public interest.

59. The damages that the Airlines will suffer are different from those suffered by the other taxpayers in the County because they will be charged higher terminal rents and user fees and lose the use of certain gate facilities.

60. Despite the Airlines' demands for compliance, the County has persisted in proceeding with the American Agreement, even though it is in violation of the Florida Constitution and the Florida Port Authorities Act, and the Airlines seek relief from the doubt that has arisen about the rights, powers, status and privileges of the parties.

61. An actual controversy exists between the Airlines and the County regarding the County's authority to issue bonds and assess unreasonable and discriminatory terminal rents and user fees to finance the American Project.

62. The Airlines seek a judicial determination of the County's authority under state law to issue bonds and assess unreasonable and discriminatory terminal rents and user fees in accordance with the American Agreement.

-19-

WHEREFORE, the Airlines request that this Court enter judgment (I) declaring that (a) the County lacks authority under the Florida Constitution and the Florida Port Authorities Act to issue general airport revenue bonds pursuant to the American Agreement; (b) terminal rents and user fees to pay the debt service on those bonds would be unreasonable, discriminatory, excessive, and solely to benefit a private party; and (c) for such other and further relief as the Court deems just and proper under 28 U.S.C. § 2201 and § 2202; and (II) permanently enjoining the County from (a) issuing general airport revenue bonds for the payment of the American Project; and (b) assessing terminal rents, user fees or charges of any kind based upon costs incurred in the construction of the American Project.

## COUNT IV. Breach of the Leases

63.  The Airlines[9] repeat and reallege each allegation in paragraphs 1 through 29 as if fully alleged here.

64.  The County's actions in reaching the American Agreement constitute a breach of its Leases with the Airlines.

65.  On or about April 28, 1987, Piedmont Aviation, Inc. entered into one of the Leases with the County.  That lease was assigned to USAir as its successor.

66.  All of the Airlines have substantially similar leases which incorporate the same provisions as those in USAir's lease.

------

[9]For the purposes of Count IV, the term "Airlines" does not include Delta Airlines who is not bringing this count.

-20-

67.   The Leases represent a long standing relationship and course of dealing between the parties.   The periodic re-execution of the Leases has become a matter of mere formality.

68.   All parties received adequate consideration for the Leases in a bargained for exchange and the leases are current.

69.   The County's Agreement with American breaches the Leases as follows:

a.   The Agreement violates the terms of the 1954 Trust Agreement which is incorporated by reference into Article 20 of the Leases (Article 19 in the case of Air Canada).   The Trust Agreement requires that fees be based upon use and obligates the County to operate the Airport in an efficient and economical manner.   As described above, the Agreement will cause fees that are discriminatory, inefficient, and uneconomical.   Furthermore, American's exclusive arrangement is not in keeping with the County's own definition of efficiency as defined in its Official Statements issued with the bonds.

b.   The Agreement violates Article 11 of the Leases, in which the County covenants not to assess discriminatory fees and charges and to allow the tenant to use the gate facilities in common with the other airlines.   Furthermore, at the time of the Leases, the County had the expressly stated policy of not assigning exclusive gate rights.   This policy is incorporated into the Leases through Article 20 via the 1954 Trust Agreement, the amendments thereto, the course of dealing of the parties, and the Official Statements of the County.

-21-

COLL DAVIDSON CARTER SMITH SALTER & BARKETT • PROFESSIONAL ASSOCIATION • ATTORNEYS AT LAW • (305) 373-5200

70.  By reason of the County's breach of the Leases, the Airlines have suffered or will suffer damage.

71.  Despite the Airlines' demands for compliance, the County has persisted in proceeding with the American Agreement, even though it will cause violations of the Leases.

72.  In order to halt the County's breach of the Leases before the Revenue Bonds are issued and the Airlines suffer millions of dollars in damages from improper rents and fees, the Airlines seek a judicial determination of the County's obligations under the Leases not to assess unreasonable and discriminatory terminal rents and user fees, not to assign exclusive gate rights, and not to undertake inefficient and uneconomical courses of action without the approvals required.

WHEREFORE, the Airlines request that this Court enter judgment declaring that (a) any terminal rents and user fees assessed in order to pay the debt on general airport revenue bonds in accordance with the American Agreement would be: unreasonable, discriminatory, and excessive; (b) the American Project is inefficient and uneconomical; (c) the County has breached and would be in breach of the Leases if it attempted to finance the American Agreement as planned through equal terminal rents and user fees for unequal facilities, or if it granted American exclusive gate rights; and (d) for such other and further relief as the Court deems just and proper under 28 U.S.C. § 2201 and § 2202.

-22-

)                                )

COUNT V. Declaratory Relief Based upon the Supporting Agreements

73.   The Airlines[10] repeat and reallege each allegation in paragraphs 1 through 29 as if fully alleged here.

74.   The County's actions in reaching the American Agreement constitute a breach of its Supporting Agreements with the Airlines.

75.   On or about July 16, 1985, Piedmont Aviation, Inc. entered into a Supporting Agreement to the 1954 Trust Agreement, and supplements and amendments thereto, with the County.  The Supporting Agreements were assigned to USAir as its successor.

76.   All of the Airlines have substantially similar Supporting Agreements with the County.

77.   All parties received adequate consideration for the Supporting Agreements in a bargained for exchange and the Supporting Agreements are current.

78.   The County's actions in performing the American Agreement would constitute a breach of the Supporting Agreements with the Airlines because:

a.   The American Agreement will result in a violation of the Supporting Agreements because the County covenanted that it would not incur expenses for the operation, maintenance, and administration of the Port Authority Properties in excess of those required to prudently manage the Airport.  The inefficient

---

[10]For the purposes of Count V, the term "Airlines" does not include Air Canada and Trans World Airlines who are not bringing that count.

-23-

and uneconomical American Project will result in a violation of
that clause.

      b.    The County is also obligated to negotiate with the
Airlines about the budget and give good-faith consideration to
their suggestions.  To create this massive budget item without
negotiating with the Airlines would violate that clause.

      c.    The American Agreement will result in a violation
of the Airlines' rights as MII members, because the significant
changes to the Program 70's construction to result from the
American Agreement were not approved by the MII, and the changes
in terminal rents and user fees to result from the American
Agreement were neither negotiated with the Airlines nor was due
consideration given to their input.

    79.  The rights and obligations in the Supporting Agreements
exist as to each Airline for so long as the bonds are
outstanding, provided that the Airline continues to serve the
Airport.

    80.  By reason of the County's breach of the Supporting
Agreements, the Airlines have suffered or will suffer damage.

    81.  Despite the Airlines' demands for compliance, the
County has persisted in proceeding with the American Agreement,
even though it will cause violations of the Supporting
Agreements.

    82.  An actual controversy exists between the Airlines and
the County regarding the County's obligations under the
Supporting Agreements to have MII approval for the American

COLL DAVIDSON CARTER SMITH SALTER & BARKETT • PROFESSIONAL ASSOCIATION • ATTORNEYS AT LAW • (305) 373-5200

Project, to prudently manage the Airport, and not to assess discriminatory and unreasonable user fees to service the debt which will be used to pay for the American Project and partially demolish the existing facilities for which the Airlines will continue to pay.

83.   In order to halt the County's breach of the Leases before the Revenue Bonds are issued and the Airlines suffer millions of dollars in damages from improper rents and fees, the Airlines seek a judicial determination of the County's obligations under the Supporting Agreements to prudently manage the Airport, not to assess unreasonable and discriminatory user fees, and not to change the present concourses without submitting it to the MII members for approval.

WHEREFORE, the Airlines request that this Court enter judgment declaring that (a) any user fees assessed in order to pay the debt on general airport revenue bonds in accordance with the American Agreement would be: unreasonable, discriminatory, and excessive; (b) the American Project is contrary to the prudent management of the Airport; (c) the County has breached and would be in breach of the Supporting Agreements if it attempted to finance the American Agreement as planned through equalized user fees for unequal facilities; (d) the County must first obtain MII approval for the American Project before beginning that Project; and (e) for such other and further relief as the Court deems just and proper under 28 U.S.C. § 2201 and § 2202.

COLL DAVIDSON CARTER SMITH SALTER & BARKETT • PROFESSIONAL ASSOCIATION • ATTORNEYS AT LAW • (305) 373-5200

)                                        )

Barry R. Davidson, Esquire
Richard C. Smith, Esquire
COLL DAVIDSON CARTER SMITH
    SALTER & BARKETT, P.A.
Counsel for Plaintiffs
3200 Miami Center
201 South Biscayne Boulevard
Miami, Florida  33131-2312
Tel:  (305) 373-5200
Fax:  (305) 374-7296


By: _Barry R. Davidson_____
    Barry R. Davidson
    Florida Bar No. 107678


Dated:  September 15, 1995
97016

95-2037

# CIVIL COVER SHEET

CIV - KING

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I (a) PLAINTIFFS**

AIR CANADA, INC., DELTA AIR LINES, INC., TRANS WORLD AIRLINES, INC., UNITED AIRLINES, INC., and USAIR, INC.

**DEFENDANTS**

MAGISTRATE JUDGE
GARBER

DADE COUNTY, A Political Subdivision of the State of Florida

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Barry R. Davidson, Esq., Coll Davidson Carter Smith Salter & Barkett, P.A., Suite 3200, 201 South Biscayne Boulevard, Miami, Fla., 33131. Tel. 305-373-5200

ATTORNEYS (IF KNOWN)

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

**II. BASIS OF JURISDICTION** (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

A South 95-2037-CIV-JLK BL

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

49 USC 40116

**IVa.** 10 days estimated (for both sides) to try entire case.

**V. NATURE OF SUIT** (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|

A CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
B ☐ 151 Medicare Act
B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
B ☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury—Med Malpractice
☐ 365 Personal Injury—Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
B ☐ 371 Truth in Lending
B ☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

A FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

LABOR
☐ 710 Fair Labor Standards Act
B ☐ 720 Labor/Mgmt. Relations
B ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
B ☐ 791 Empl. Ret. Inc. Security Act

A BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

A OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
B ☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☒ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

A REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
B ☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

A CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

B PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence Habeas Corpus:
☐ 530 General
☐ 535 Death Penalty
B ☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

*A or B

**VI. ORIGIN** (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Refiled
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ Excess of $50,000   Check YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____  DOCKET NUMBER _____

DATE
September 15, 1995

SIGNATURE OF ATTORNEY OF RECORD
Barry R. Davidson

UNITED STATES DISTRICT COURT
S/F I-2
REV. 6/90

FOR OFFICE USE ONLY: Receipt No. 653076   Amount: 8/120.00
Date Paid: 9/15/95 PM   M/ifp: