UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

| | | |
|---|---|---|
| AIR CANADA, INC., DELTA AIR LINES, INC., TRANS WORLD AIRLINES, INC., UNITED AIRLINES, INC., USAIR, INC., | : : : : : | CASE NO. 95-2037-CIV-LENARD MAGISTRATE JUDGE GARBER |
| Plaintiffs, | : : : | |
| v. | : : | |
| DADE COUNTY, a political subdivision of the State of Florida, and AMERICAN AIRLINES, INC., | : : : : : | **DEFENDANT DADE COUNTY'S RESPONSE TO MOTION TO STRIKE OBJECTIONS TO STIPANCIC AFFIDAVIT** |
| Defendants. | : : | |

Defendant, Dade County ("County"), responds to the Plaintiffs' Motion to Strike Dade County's Objections to Stipancic Affidavit and provides the Court with the following Memorandum of Law.

## **MEMORANDUM OF LAW**

I.    Background

In response to Motions for Summary Judgment filed by the County, and purportedly in support of their own Motion for Summary Judgment, the plaintiff Airlines filed an Affidavit of Charles Stipancic, Jr. ("Stipancic Affidavit").  On August 20, 1996, the County filed its Objections to the Admissibility of Stipancic Affidavit ("County's Objections").  In County's

Objections, County showed that the Stipancic Affidavit ran afoul of Federal Rule of Civil Procedure 56(e), which requires that affidavits supporting motions for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matter stated therein." Fed.R.Civ. P. 56(e).

The Airlines now move to strike the County's Objections. The Airlines offer no defense of the Stipancic Affidavit. Rather, they attack County's purported failure to object to the Affidavit with sufficient particularity.

II.     County's Objections Are Sufficient and Well-Founded

The Airline's Motion is unfounded. While the County did offer several general objections to the Affidavit, it also offered very particular objections. The general objections were by no means intended as bludgeoning tactics, nor intended to require the Court to parse through the objectionable affidavit to find its inadequacies. Rather, County offered the general objections to show the Court that the Stipancic Affidavit does not comply with the rule requiring that affidavits be made on personal knowledge. The Stipancic Affidavit, as a whole, is no more than legal argument put in the form of an affidavit to attempt to elevate it to the status of evidence. It is not evidence, but merely a recitation of the Airlines' allegations in this case. It is replete with unsupportable factual and legal conclusions. "Mere conclusory allegations are not competent summary judgment evidence." See Richardson v. Oldham, 12 F.3d 1373, 1378 (5th Cir. 1994).

Similar to the present case, in National Union Fire Insurance Company v. Siliconix, Inc., 726 F. Supp. 264, 269 (N.D. Cal. 1989), the court struck from an affidavit a statement that an

2

insurer accepted the tender of a patent suit "subject to a full reservation of right" because it was a conclusion. The court reasoned that it "would need to know the exact language used" in the document in question, "the terms of the policies," and "other facts" before determining the ultimate issue of whether there had been a reservation of rights. Id. Similarly here, Mr. Stipancic's various conclusory statements (more particularly identified below) should be stricken.

In addition to the well-founded general objections, the County offered particularized objections. The County objected to the Stipancic Affidavit paragraph by paragraph, reciting specific objections to materials contained within each paragraph. Such objections are reasonably specific to allow the Court to decide, for each paragraph, whether the matters contained in that paragraph are in fact objectionable and should not be considered.

III.     More Particular Objections

Notwithstanding the sufficiency of County's Objections, to aid the Court further in determining the insufficiency of the Stipancic Affidavit, the County offers the following specific objections:

> Affidavit Paragraph 3
>
> The Super A is a dedicated terminal for American Airlines that will encompass the area now occupied by the north side of the terminal and Concourses A through D. The County first envisioned the building of the Super A in 1993, when it executed the preliminary contract with American. (Def.'s Mot. Summ. J., Ex. 24). That preliminary agreement called for the reconfiguration of the entire north-side of the airport in order to construct a unique linear terminal area from which American would conduct hub operations. Id. The Super A (as it was called by the County and American at the time) would contain 60 gate positions (later changed to 58) for aircraft enplaning and deplaning, 47 of which would be used by American for its hub operations. Id.

3

This paragraph contains Mr. Stipancic's recharacterization and mischaracterization of a contract between the County and American. The Court can review those documents and make its own conclusion as to their legal consequences. See Fed.R.Ev. 701 (lay opinions inadmissible unless helpful to determine a fact at issue). The statements are also objectionable as legal conclusions because the contract itself is the best evidence of its meaning.

> #### Affidavit Paragraph 4
>
> The Super A will be superior to other facilities at the Airport. For example, it will have an automated, laser-sortation baggage system, specifically designed for American's use, and a floor dedicated to a train system to shuttle American's passengers from gate to gate, in addition to moving walkways. It will also have extra-wide holdrooms and concourses, and disproportionately more ticket counters, baggage facilities, Federal Inspection Service facilities, and curb frontage.

This paragraph contains specific statements and opinions as to the design of the A-D. Mr. Stipancic offers no basis to support his opinions, and accordingly these statements are objectionable for lack of foundation, and as improper opinion testimony. Fed.R.Ev. 701. They are also irrelevant, for the reasons set forth in the Defendant's Motion in Limine and Accompanying Memorandum of Law to Preclude Judicial Reconsideration of Political Decisions and/or to Accord Such Decision's Due Deference, filed October 8, 1996 ("Motion in Limine Regarding Political Decisions"). See also Fed.R.Ev. 402.

> #### Affidavit Paragraph 5
>
> At the airports with which I am familiar, such dedicated terminals are generally paid for by the airline for which that facility is built, and they are typically financed with special facility revenue bonds. Those bonds require such an airline to pay for its own special facilities and to make a financial commitment to repay the debt.

4

Mr. Stipancic's general conclusions as to what is "generally paid for" by airlines at other

airports is improper opinion, not supported by a proper foundation. Fed.R.Ev. 701. The Court,

and the County, are left to wonder at what "other airports" Mr. Stipancic is familiar with, and the

County is unable to test the accuracy of his conclusions. Accordingly, the statements are

objectionable for lack of foundation, and for lack of a showing of competence and personal

knowledge. Fed.R.Civ.P. 56(e). The statements as to what happens at other airports are also

irrelevant, as the practice at other airports, whatever it may be, is not legally binding upon the

County in its administration of its Airport. Fed.R.Ev. 402.

### Affidavit Paragraph 7

> The County has never before constructed a project of this type,
> quantitatively or qualitatively. It has never before constructed a
> unit terminal dedicated to a single carrier under the current rate-
> making system. The County has never sought to undertake a
> significant capital project over the express objections of the MII.

Mr. Stipancic's statements regarding a purported first-time practice at the Airport are

irrelevant to any issue in the case. Fed.R.Ev. 402. The fact that an action has not been taken

before by the County can in no way be read to preclude it from taking such action at this point, if

the County as a political body finds it to be in the best interest of the County. See Motion in

Limine Regarding Political Decisions.

### Affidavit Paragraph 8

> The County now asserts in its motion that it built Concourse A
> without MII approval, but that contradicts the County's earlier
> representations to the MII. Before the project's construction,
> American asserted, as an MII carrier, that Concourse A had not
> been approved. See Exhibit "A," a letter from Frank Erickson, of
> American Airlines, to Frederick Elder, the Aviation Director, on

5

> November 18, 1991. The County, while claiming that it did not
> feel MII rights were necessary, asserted that it had earlier obtained
> the necessary approval informally. See Exhibit "B," a letter from
> Frederick Elder to Frank Erickson, on November 27, 1991. The
> County further stated that the other MII carriers had no objection to
> the plan. Id. American apparently withdrew its objections without
> litigation, and it will now coopt Concourse A as part of the Super
> A. With regard to Concourse A, American Airlines asserted
> objections that are virtually identical to those asserted by the
> Airlines in this case with regard to the Super A.

Mr. Stipancic's statements regarding County's "representations to the MIA" are no more than his own characterizations of the contents of documents which the Court can read and interpret for itself. His opinion testimony is therefore inadmissible. Fed.R.Ev. 701. The documents in question are attached to the Stipancic Affidavit, and are the best evidence of their contents. Moreover, a review of one of the documents, a letter to Frank R. Erickson from Frederick A. Elder, contradicts Mr. Stipancic's conclusion that "it had earlier obtained the necessary approval." The letter in question states that "[the Airlines' representative] Harry Taylor, pointed out . . . that this particular concourse was not in Program 70's and 'must be approved by the Airlines'. I was very clear in my explanation that these projects do not need approval, as such, in order for the Department to proceed with their completion." Hence, the Court should disregard Mr. Stipanncic's mischaracterization of documents which the Court can review for itself.

### Affidavit Paragraph 9

> In 1993, when the Super A was first suggested, USAir and the
> other MII air carriers stated their objections to the program and to
> the possibility of being forced to pay for the facility through the
> relatively new equalized rates and charges system that applied to
> the existing facilities. The MII members, including all Count V
> plaintiffs, also asserted our rights, and we informed the County that

6

> it could not finalize the scheme called for in its preliminary
> agreement with American. These objections were made before the
> County executed the preliminary agreement. The County, for
> whatever reason, informed us that in conjunction with American it
> would reevaluate the Super A plan and consider less costly
> alternatives.

This paragraph contains a vague reference to a statement by the County, without

identifying the individual who made it, the time, or the context. Such a vague, conclusory

allegation shall not be considered. Additionally, issues of the cost of the A/D are irrelevant. <u>See</u>

Motion in Limine Regarding Political Decisions.

> ### Affidavit Paragraph 10
>
> In 1995, the County and American settled upon a slightly altered
> version of the Super A. This version looked less expensive
> because it removed 11 gates, the gates that would have been
> available for use by other airlines. As a result of that decision,
> after construction of the Super A is complete the north side of the
> terminal will contain fewer gates then exist today without the $1
> billion expenditure. See Exhibit "C," the Lease, Construction and
> Finance Agreement with American, at exhibit "D." The MII
> members have been informed by the County at the MAAC
> meetings that in order to replace the lost gates, it must construct
> other terminal projects; this fact is also apparent upon review of the
> proposed construction sequence planning plates. We have further
> been informed that the Super A requires dual taxiways, thus
> Concourse E must also be reconfigured through the destruction of
> the north end of the E satellite. (id. at plate 13), and those gates
> must also be replaced. The replaced gates will be added by
> building Concourse J (and the South Terminal project as support
> thereto) and through the extension and modification of Concourse
> E. Id. at exhibit "D."

This paragraph contains Mr. Stipancic's characterizations of documents that are available

to the Court for its own review and interpretation. Fed.R.Ev. 701. It contains argumentative and

conclusory statements as to how a new version of the A-D "looked less expensive". It contains

7

Mr. Stipancic's own characterization of the American Agreement. It contains statements as to matters that were allegedly communicated to "MII Members", apparently not to Mr. Stipancic himself, and hence such statements are not based on Mr. Stipancic's own personal knowledge. Fed.R.Civ.P. 56(e).

<u>Affidavit Paragraph 11</u>

> This "new" version of the Super A would cost nearly $1 billion according to the County's method of accounting. See Exhibit "C," the Lease, Construction and Finance Agreement with American at exhibit "C." That cost, however, does not reflect the true cost of the facility. Many of the direct and indirect costs for that facility are merely accounted for under different headings. For example (and only mentioning projects that exceed $100 million), the remainder of Concourse A, which will form part of Super A, costs nearly $164 million. (Def.'s Mot. Summ. J., Ex. 16). Concourse E modifications and the South Terminal together cost over $600 million. Id. The full, commercial, air-carrier north runway is essential to the Super A scheme, and called for in the agreement with American. That project costs over $154 million. (Def.'s Mot. Summ. J., Ex. 16). There are numerous other related costs, and this description does not even discuss the hundreds of millions of dollars spent for American in recent years, and which will be spent for American in the next ten years, in order to provide interim facilities until the Super A is finished. These other improvements are also called for in the County's agreement with American. See Def.'s Mot. Summ. J., Ex. 24 at ¶ 5.

This paragraph contains speculative statements as to what the "true cost" of the A-D will be. Mr. Stipancic offers no foundation for his conclusions, and the Court should disregard his speculations. Moreover, it contains argumentative, but irrelevant, comments as to past expenditures allegedly to benefit American, without any basis for those statements. Finally, it contains, again, Mr. Stipancic's characterizations of the American Agreement.

Affidavit Paragraph 12

The County has a policy of not granting exclusive gate rights, either directly or indirectly, in order to manage the airport in the most efficient manner. This is an official policy, which has been published in the County's bond prospectuses to promote the sale of airport bonds. See Exhibit "D," Official Statement of Dade County, Aviation Revenue Bonds, Series X, at 17, 23-24 (July 15, 1992). The County describes this policy as follows:

> [Since the expiration of the original 1945 leases, t]he Aviation Department controls 100% of the gate assignment and use at the Miami International Airport. This control provides the Aviation Department with the ability to allocate gate capacity to new entry airlines or to incumbent airlines expanding service in the market, or to accommodate replacement airline operations in the event of a major airline service interruption. <u>It is County policy not to enter into any additional leases or other agreements that would directly or indirectly result in an exclusive gate use agreement that would prevent the assignment of the use of such gates and related resources to other airlines.</u> Such policy provides the County with the ability to maximize the use of all gates, thus minimizing expansion requirements and the attendant costs that might be incurred if gates were exclusively leased to individual airlines.
> Id. at 17 (emphasis added).

For the reasons set forth in the Defendants' Motion in Limine to Exclude Evidence Supporting Claims Based upon the 1954 Trust Agreement, filed October 8, 1996, the County's alleged policy regarding granting exclusive gate rights is irrelevant. Mr. Stipancic's characterization of the policy is unnecessary.

Affidavit Paragraph 13

9

> Common-use gates compose one of the facilities to which the
> airlines have common use rights in Article 11 of their leases. See,
> e.g., Def.'s Mot. Summ. J., Ex. 18).

Mr. Stipancic's statements regarding the Airlines' rights based on their leases is a legal

conclusion; further the leases in question do not say that <u>gates</u> are common use facilities.  The

Court can determine the Airlines' rights based on its own review of the leases themselves.

Additionally, the legal conclusion is irrelevant because there is no connection between the lease

provision in question and the American Agreement.

### Affidavit Paragraph 14

> Nevertheless, the agreement with American includes a notable
> exception to the common-use gate policy at MIA.  As long as
> American maintains a certain number of flights, it is entitled to
> effectively exclusive gate rights.  (Def.'s Mot. Summ. J., Ex. 24,
> ¶ 4.a.) (stating that American's rights of use will only be upon the
> normal assignment basis if its flights drop below the 250 flight
> threshold).

Mr. Stipancic's statement regarding the American Agreement is argumentative,

irrelevant, and a legal conclusion.

### Affidavit Paragraph 15

> After negotiating this deal with American, the County immediately
> changed its existing policy in its next prospectus governing gate
> assignment and use to create an exception for American, but
> retained the policy for all others.  See Exhibit E, Official Statement
> of Dade County, Aviation Revenue Bonds, Series "Y," at 18 (April
> 15, 1993).  The policy now provides:

> > <u>Except as discussed below as to American Airlines,</u>
> > it is County policy not to enter into any additional
> > leases or other agreements that would directly or
> > indirectly result in an exclusive gate use agreement
> > that would prevent the assignment of the use of such
> > gates and related resources to other airlines.  Such

>policy provides the County with the ability to
>maximize the use of all gates, thus minimizing
>expansion requirements and the attendant costs that
>might be incurred if gates were exclusively leased
>to individual airlines.
>Id. at 17 (emphasis added).

The County's gate-use policy is irrelevant. Mr. Stipancic's legal conclusions concerning

that policy are unnecessary.

### Affidavit Paragraph 16

>As admitted by the County, and to the best of my knowledge, no
>other airline at MIA has the same degree of gate control that
>American has in its agreement to build the Super A. American's
>rights far exceed those possessed by the other airlines, and they are
>effectively exclusive rights. Formerly, Eastern Airlines had
>exclusive gate rights, because its facilities were built by Special
>Facility Revenue Bonds, which were paid solely by Eastern
>Airlines and which were guaranteed by Eastern Airlines.

Mr. Stipancic's comparison of the relative legal rights of airlines operating at the Airport

are legal conclusions to be made by the Court. His statement with regard to Eastern Airlines

lacks any foundation, and does not show what personal knowledge he may have regarding

Eastern's former operations and legal relationships at the Airport. Additionally, as previously

stated, the County's gate-use policy is irrelevant. Those documents would provide the Court

with the best evidence of their contents.

### Affidavit Paragraph 17

>At one time, USAir had preferential gate rights in a few certain
>gates. Preferential rights merely meant that if USAir had an
>aircraft that needed to use one of those gates at a certain time, it
>would have preference over other airlines when the County
>assigned that gate at that time. However, the other airlines had the
>ability to use that gate. American's agreement prevents others from

11

using its gates even if it does not need a particular gate at the time, as long as it averages 250 flights per day.

The County's gate-use policy is irrelevant. Mr. Stipancic's statements as to USAir's and American's legal rights are legal conclusions for the Court. Additionally, his statements as to USAir's rights lack any foundation, as the documents purportedly establishing those rights are not presented to the Court with the Affidavit.

### Affidavit Paragraph 18

In the wake of the American Airlines agreement, the other carriers will no longer have the common use right to all gates at the airport (currently 108 gates), but after ten years and billions of dollars in construction costs, they will only have the right to those not occupied by American (74 gates, see Exhibit "C," the Lease, Construction and Finance Agreement with American at exhibit "D," plate 18). American, on the other hand, will have the exclusive right to its own facility, and the common use right to all other facilities.

Mr. Stipancic's characterizations of the American Agreement are argumentative, and consist of legal conclusions that are the Court's to make. Additionally, the comparison of the availability of gate use is irrelevant for the simple reason that none of the Airlines will be adversely affected in the gates they use by the A-D construction, because none of the Airlines uses any gates in the A, B, C or D concourses.[1]

### Affidavit Paragraph 19

As admitted by the County at MAAC meetings, orally and through the presentation of written reports, the Super A will require the demolition of Program 70's projects which were financed under § 210 of the 1954 Trust Agreement, some of which were recently

---

[1]     Delta Airlines and USAir utilize Concourse H.  United utilizes Concourse F. TWA and Air Canada utilize Concourse G.

12

completed such as Concourse B, and for which debt is still
outstanding. Exhibit "F," a letter from Douglas Prescott, the
Consulting Engineer, to Spencer Ballard, of the County's Aviation
Department, on May 4, 1994 (presented to the MII by the County
as a "comfort letter" from the County's Consulting Engineer).
There are currently bonds outstanding for those portions of the
airport.

Mr. Stipancic's characterizations of the letter from Douglas Prescott are unnecessary, as

the Court can review the letter for itself.

### Affidavit Paragraph 20

The Airlines will continue to pay for that debt (along with the debt
on additional projects that will be constructed for American's
interim use and then demolished for the Super A) through our rates
and charges. These unamortized costs form part of the true, but
hidden, cost of the Super A.

There is no foundation established for Mr. Stipancic's conclusions as to the "true, but

hidden, cost" of the A-D.

### Affidavit Paragraph 21

Thus, the Super A will demolish facilities in Concourses A through
D, which are being paid for by the other airlines, and many of
which are used by the other airlines, and replace it with American's
terminal, which the other airlines cannot use, but for which they
will also have to pay.

The statement is argumentative, conclusory, and not shown to be based on personal

knowledge. Moreover, it is blatantly misleading, in that it appears to imply that the construction

of the A-D will require demolition of facilities which the Airlines use. In reality, none of the

Airlines use any of the facilities which will be affected by the construction of the A-D. See

Footnote 1, supra.

13

## CONCLUSION

County's objections were sufficient, in the first instance, to apprise the Court of the objectionable nature of the statements contained in the Stipancic Affidavit. Nonetheless, in this response, the County has established with even greater particularity its objections. Therefore, the County asks that the Court sustain its objections and disregard the Stipancic Affidavit in ruling on the pending Motions for Summary Judgment, or alternatively, disregard such portions of the Affidavit as the Court finds objectionable.

Respectfully submitted,

ROBERT A. GINSBURG
COUNTY ATTORNEY
Attorneys for Defendant Dade County
Office of the County Attorney
P.O. Box 592075
Miami, Florida 33159
(305) 876-7040

By: _____

Thomas P. Abbott, Esq.
Florida Bar No. 102920
Gail P. Fels, Esq.
Florida Bar No. 092669

14

## CERTIFICATE OF SERVICE

I CERTIFY that true and correct copies of the foregoing were served by telefax and U.S.

Mail this  11th day of October, 1996 upon:

> Barry R. Davidson, Esq.
> Richard C. Smith, Esq.
> Coll, Davidson, Carter, Smith, Salter & Barkett, P.A.
> Counsel for Plaintiffs
> 3200 Miami Center
> 201 South Biscayne Boulevard
> Miami, Florida 33131-2312
>
> Alvin B. Davis, Esq.
> William K. Hill, P.A.
> Frank R. Jimenez, Esq.
> Steel Hector & Davis LLP
> 200 South Biscayne Boulevard
> Suite 4000
> Miami, Florida 33131-2398

By:  _____
     Thomas P. Abbott, Esq.

15